1

2

3

4

5

6

7

8                               UNITED STATES DISTRICT COURT
                              WESTERN DISTRICT OF WASHINGTON
9                                       AT TACOMA

10    JAMES MITCHELL,

11                       Petitioner,                    CASE NO. 3:20-cv-05623-JLR-JRC

12          v.                                          REPORT AND RECOMMENDATION

13    ERIC JACKSON,                                     NOTED FOR:  November 6, 2020

14                       Respondent.

15

16          The District Court has referred this petition for a writ of habeas corpus under 28 U.S.C. §

17    2254 to United States Magistrate Judge J. Richard Creatura.  The Court's authority for the

18    referral is 28 U.S.C. §§ 636(b)(1)(A)–(B) and local Magistrate Judge Rules MJR3 and MJR4.

19          In 1993, the victim was murdered in her apartment, and in 2016, a jury convicted

20    petitioner of first-degree murder for killing her—a conviction based largely on DNA

21    (deoxyribonucleic) testing of blood evidence collected from the crime scene.  Petitioner now

22    brings this petition challenging his conviction.  He argues that the state courts erred when they

23    rejected his arguments that the trial court improperly excluded evidence of another suspect in the

24    investigation and allowed police officers who had forgotten the investigation to read from their

1    reports.  And he argues that the prosecutor committed misconduct during closing argument and

2    that his trial counsel rendered ineffective assistance in various regards.

3    These arguments fail to show that the state courts' decisions were contrary to or

4    unreasonable applications of clearly established federal law.  The trial court properly excluded

5    the "other suspect" evidence where the link between the "other suspect" and the crime was

6    tenuous, and the Confrontation Clause was not violated by allowing the officers to read from

7    their reports because the officers were subject to cross-examination.  The challenged closing

8    argument was proper, and plaintiff fails to show that his counsel rendered ineffective assistance.

9    Therefore, the Court should deny the habeas petition.

10                                      **BACKGROUND**

11    **I.  Proceedings in Federal Court**

12    Petitioner, represented by counsel, brought suit in this Court in June 2020.  Dkt. 1.

13    Petitioner lists the following grounds for relief in his petition:  (1) that he was deprived of his

14    right to present a defense when the trial court excluded evidence of an "other suspect," Lee

15    Chandler; (2) that the prosecutor engaged in misconduct during closing argument; (3) that

16    allowing police witnesses to read directly from their reports violated the Confrontation Clause;

17    and (4) that trial counsel rendered ineffective assistance in various regards.  *See generally*, Dkt.

18    1.

19    The Court directed service of the petition (Dkt. 2), and respondent has filed an answer

20    and the state court records of proceedings.  Dkts. 8, 9.  The matter is ripe for review.

21    **II.  Proceedings in Trial Court**

22    In 2015, the State charged petitioner with first degree murder.  *See* Dkt. 9-2, at 1446.

23    Before trial, the State moved to exclude evidence suggesting that Chandler, who had known the

24

victim, had killed her. Dkt. 9-1, at 1186. Over petitioner's opposition (*see* Dkt. 9-1, at 1193),

the trial court excluded the evidence. Dkt. 9-1, at 1238. However, the trial court ruled that it

would allow petitioner to relitigate the issue based on the evidence at trial. Dkt. 9-1, at 1238.

The State also moved to admit portions of police reports written by Officer Hilding Johnson,

who no longer remembered his actions pertaining to the case. *See* Dkt. 9-1, at 1210. Over

petitioner's opposition (*see* Dkt. 9-1, at 1219), the trial court admitted the evidence, as well as

documents drafted by Officer Ted Schlosser, who also did not recall the case. *See* Dkt. 9-1, at

1237.

Division Two of the Washington State Court of Appeals summarized the case as follows:

> On the night of February 6, 1993, Robinson's [the victim's] young nieces and nephew were spending the night at Robinson's apartment in Spanaway. The children were in the living room. Around 10:30 PM that night, Robinson was talking on the telephone with her friend George Caldwell. Robinson told Caldwell that somebody was at the door. Caldwell heard Robinson talking to another person and said Robinson sounded "submissive," telling the person "okay, okay." [Citation omitted.] Then the connection went dead.
>
> Around 11:00 PM, the oldest child was awakened by the sound of the apartment's smoke alarm. She went to the kitchen where she saw food burning on the stove and Robinson lying on the kitchen floor surrounded by blood. A neighbor called the police.
>
> The autopsy showed that Robinson had 10 stab wounds in her back. Multiple stab wounds penetrated her chest cavity and punctured her lung and liver, and she had defensive wounds on her hands and forearms and superficial cuts to her chest and torso. Law enforcement did not find a murder weapon at the scene.
>
> Police officers and forensic investigators searched Robinson's apartment for evidence and collected blood evidence. There was blood on Robinson and around the kitchen, including a large blood smear on the refrigerator. There was a small smear of blood on the hallway wall across from the bathroom door. There were also blood spatters in front of a nightstand in Robinson's bedroom. The telephone cord, which had been ripped out of the wall, and a jacket from the bedroom appeared to have blood on them.
>
> At the time, none of the evidence was tested for DNA because the science had not yet been developed to allow for DNA analysis of blood.
>
> *Discovery of Bloody Knife and Sawed-Off Shotgun*
>
> On either February 6, the day of Robinson's murder, or February 7, a bloody knife and a sawed-off shotgun were found in Lakewood. The location where the items were found was not near the scene of Robinson's murder. James O'Hern, the

detective leading Robinson's murder investigation, noted the discovery in his investigation notebook under a different incident number than the one assigned to Robinson's murder.

A sheriff's office property report noted that the items should be processed for fingerprints and possible blood on the knife blade. It is unclear whether any follow up was done regarding the knife or the shotgun.

*Other Suspect Investigation*

Robinson had been seeing a few men around the time of her death. One of these men was Lee Chandler. Chandler was temporarily separated from his wife and he and Robinson occasionally got together to smoke crack cocaine. They had sex a few times but were primarily just friends.

A few weeks after the murder, Robinson's friend Mark McGruder was interviewed. McGruder occasionally smoked with Robinson and had also lived with Chandler for a time. McGruder stated that Chandler used Robinson as a runner for crack. Robinson and Chandler occasionally loaned each other money for drugs. When Chandler smoked he would become scary and paranoid. But McGruder denied ever seeing Chandler get violent. Chandler and McGruder one time had gotten into a tussle, but McGruder said that Chandler did not try to hurt him.

Investigators interviewed Chandler a few times in connection with Robinson's death. Chandler told investigators that he had been arrested once before for a domestic violence assault against his wife, losing his temper and striking her after witnessing her attempt to buy drugs just after completing a drug treatment program. Chandler also said that he had once assaulted a man staying in his residence during a dispute over payment of an electric bill. Chandler denied any involvement in Robinson's death.

Chandler became the focus of the investigators' attention. He took a voluntary polygraph test, which he failed. The polygraph showed "significant emotional disturbances indicative of deception" in response to the questions regarding his involvement with Robinson's death. [Citation omitted.]

Because Chandler was involved in illegal drug activity with Robinson, and because he failed the polygraph, he became the number one suspect in O'Hern's mind. Chandler was booked into jail on unrelated warrants after one of the interviews. However, investigators never obtained any evidence that would allow them to arrest Chandler. Robinson's murder investigation remained unsolved.

*Reopening of Case*

In 2013, another detective reopened Robinson's case and arranged to have the blood evidence tested for DNA. Using a control sample of Robinson's blood from her autopsy, forensic scientists created Robinson's DNA profile. They then tested the blood samples taken from the bedroom, the jacket, the telephone cord, and Robinson's jeans. Several samples contained mixed DNA from both Robinson and an unknown person. Blood found on a bedroom dresser contained DNA that matched the unknown person.

The DNA profile for that the unknown person matched Mitchell's DNA profile. Mitchell was located in Florida, where he was arrested on charges of first degree premediated murder and brought to Washington for trial.

. . . .

1

*Trial Testimony*

2
Forensic investigators Hilding Johnson and Ted Schlosser testified regarding their participation in the 1993 investigation of Robinson's murder. Neither investigator independently recalled the crime scene at trial. Both investigators testified by reading directly from their 1993 reports.

3

4
After O'Hern testified that he had interviewed many of Robinson's friends and acquaintances after her death but failed to identify a suspect, defense counsel asked the trial court to revisit its ruling on other suspect evidence. The trial court ruled that Mitchell could inquire about the investigation of Chandler.

5

6
On cross-examination, O'Hern testified that he interviewed Chandler several times and finally took a taped statement, and that he also interviewed Chandler's wife. And he kept a copy of Chandler's driver's license on top of the file on Robinson's murder until he retired.

7

8
The forensic scientist who completed the DNA testing on items from the crime scene testified that blood on the jeans Robinson was wearing when she was found was consistent with both Robinson and Mitchell's DNA profiles. A significant amount of Mitchell's DNA was also on a jacket found in Robinson's apartment and on the telephone cord. Mitchell's DNA also was found in samples from Robinson's bedroom vanity and two envelopes found at the scene.

9

10

11
Mitchell testified at trial that he knew Robinson and had been at her apartment a few times. The last time he was there some kids were asleep in the living room. He said that while he was with Robinson, she answered a knock at the door. An agitated man entered the apartment and tried to hit Robinson and Mitchell. Mitchell said that Robinson tried to get the man to leave and threatened to call the police, but the man stayed and exchanged blows with Mitchell.

12

13

14
According to Mitchell, the man left after Robinson again told him to leave but said that he would be back. Then Mitchell followed Robinson to her bedroom and looked at himself in her dresser mirror. He later noticed that his hand was bleeding. Mitchell left the apartment and did not see Robinson again. He denied killing Robinson.

15

16

17
*Matter of Mitchell*, 11 Wash. App. 2d 1034, 2019 WL 6332169, at *1–*3 (Nov. 26, 2019).

18
The trial court sentenced petitioner to 450 months in prison. Dkt. 9-1, at 1264.

19
**III. Proceedings in State Appellate Courts**

20
Petitioner challenged his conviction on direct review, raising arguments other than those

21
presented in his grounds for relief in this matter. *See* Dkt. 9-1, at 1278. Division Two affirmed

22
his conviction (Dkt. 9-1, at 1333), and the Washington State Supreme Court denied review. Dkt.

23
9-1, at 1395. The mandate issued on February 16, 2018. Dkt. 9-1, at 1397.

24

1    On November 6, 2018, petitioner, represented by counsel, filed a personal restraint

2    petition ("PRP") in Division Two. Dkt. 9-2, at 2. In his PRP, petitioner argued, among other

3    things, that the trial court erred by excluding "other suspect" evidence and by allowing police

4    witnesses to read directly from their police reports and that the prosecutor committed misconduct

5    in closing. Dkt. 9-2, at 10. Petitioner also argued that his counsel rendered ineffective assistance

6    in various regards. Dkt. 9-2, at 11. Division Two rejected these arguments and denied the PRP.

7    *Matter of Mitchell*, 2019 WL 6332169, at *6.

8    Petitioner sought review in the Supreme Court, which issued a ruling denying his request.

9    Dkt. 9-2, at 1496. On May 11, 2020, the matter became final. Dkt. 9-2, at 1503.

10    **DISCUSSION**

11    **I. Standard of Review**

12    The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "bars relitigation

13    of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in

14    [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

15    The first exception, § 2254(d)(1), allows habeas relief on the basis that an adjudication

16    "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

17    established Federal law, as determined by the Supreme Court of the United States." The

18    Supreme Court has ruled that a state decision is "contrary to" clearly established Supreme Court

19    precedent if the state court either (1) arrives at a conclusion opposite to that reached by the

20    Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from

21

22

23

24

1  relevant Supreme Court precedent and arrives at an opposite result.  *Williams v. Taylor*, 529 U.S.
2  362, 405 (2000).

3      Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply
4  because that court concludes in its independent judgment that the relevant state-court decision
5  applied clearly established federal law erroneously or incorrectly. Rather, that application must
6  also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An
7  unreasonable application of Supreme Court precedent occurs "if the state court identifies the
8  correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts
9  of the particular state prisoner's case." *Williams*, 529 U.S. at 407.  In addition, a state court
10 decision involves an unreasonable application of Supreme Court precedent "'if the state court
11 either unreasonably extends a legal principle from [Supreme Court] precedent to a new context
12 where it should not apply or unreasonably refuses to extend that principle to a new context where
13 it should apply.'"  *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529
14 U.S. at 407).

15      The second § 2254 exception, § 2254(d)(2), provides for habeas relief if the adjudication
16 "resulted in a decision that was based on an unreasonable determination of the facts in light of
17 the evidence presented in the State court proceeding."  Federal habeas courts must presume the
18 correctness of state courts' factual findings unless applicants rebut this presumption with "clear
19 and convincing evidence."  28 U.S.C. § 2254(e)(1).  Further, review of state court decisions
20 under §2254(d)(1) is "limited to the record that was before the state court that adjudicated the
21 claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

22  **II.  Exclusion of Evidence Regarding Chandler**

23

24

Petitioner's first ground for relief is that he was deprived of his right to present a defense when the trial court excluded "'other suspect' evidence." The evidence in question was evidence that Lee Chandler was the lead detective's primary suspect in the early stages of the investigation into petitioner's murder and that Chandler had a history of violence and had failed a polygraph examination related to the investigation. Dkt. 1, at 6.

## A. Facts Related to "Other Suspect" Evidence

### 1. Evidence that Petitioner Sought to Have Admitted

Detective O'Hern—the lead detective in the 1993 investigation—stated that he learned during the investigation that Chandler was the victim's drug supplier and took drugs and drank with her. Dkt. 9-2, at 1246, 1270. Chandler had been arrested for assaulting his wife (Dkt. 9-2, at 1251) and admitted to physically assaulting another person. Dkt. 9-2, at 1252. O'Hern had been informed that Chandler could be violent to his dealers. Dkt. 9-2, at 1246.

According to detective O'Hern's investigation notes, on the night of the murder, Chandler claimed to have been home, except for 10 minutes when he went to buy drugs. Dkt. 9-2, at 1246–47. Chandler subsequently "failed" a polygraph examination and was arrested based on unrelated warrants. Dkt. 9-2, at 1247. The polygraph results indicated that Chandler was deceptive when he denied knowing who stabbed the victim and where the knife was located, being present at the scene, and being the murderer. Dkt. 9-2, at 1252.

Detective O'Hern stated in a pretrial interview that Chandler was the focus of the investigation at the time. Dkt. 9-2, at 1269. O'Hern thought that Chandler was the most likely suspect but that police never "had any evidence to arrest him." Dkt. 9-2, at 1269–70. But O'Hern also stated that he "didn't have any . . . [] other focus" in the investigation at the time. Dkt. 9-2, at 1282.

1    An acquaintance of both Chandler and the victim, Mark McGruder, similarly stated in a

2    pretrial interview that the victim was a "runner" for Chandler.  Dkt. 9-2, at 1306.  McGruder

3    thought that Chandler got "scary" when he smoked.  Dkt. 9-2, at 1307.  Although McGruder

4    stated that he had never witnessed Chandler being violent, McGruder also said that he had gotten

5    into a "tussle" with Chandler on one occasion.  Dkt. 9-2, at 1307, 1310.

6                          **2.  Trial Court's Rulings**

7    Before trial, the trial court granted the State's motion to exclude the evidence connecting

8    Chandler to the charged crime.  Dkt. 9-1, at 1238, 1398.  The trial court concluded that defendant

9    had failed to provide evidence of a sufficient connection between the crime and Chandler.  Dkt.

10   9-1, at 1238.  However, the trial court also ruled that it would allow defendant to "re-litigate the

11   issue of other suspect evidence based on evidence produced or proffered at trial."  Dkt. 9-1, at

12   1238.

13   At trial, after Detective O'Hern testified, petitioner renewed his request to admit evidence

14   that Chandler was a suspect.  Dkt. 9-1, at 694–95.  The trial court allowed petitioner to inquire

15   into Chandler's arrest in connection with the case, but not to question O'Hern regarding his

16   opinion that Chandler was the most likely suspect.  Dkt. 9-1, at 696.  Pursuant to this ruling,

17   O'Hern testified at trial that he interviewed Chandler several times in the course of the

18   investigation, including taking a recorded statement, and ultimately arrested him on unrelated

19   warrants.  Dkt. 9-1, at 744–45.  O'Hern testified that until the day he retired, Chandler's driver's

20   license was "right on top" of his stack of materials related to the case, although O'Hern did not

21   say that Chandler had failed to polygraph test or that he was the primary suspect in 1993.  *See*

22   Dkt. 9-1, at 746.

23

24

1    Based on this evidence, in closing, defendant noted in passing that police had at one point

2    focused their investigation on Chandler. Dkt. 9-1, at 1094–95.

3    ### 3. Supreme Court Commissioner's Ruling

4    In his ruling denying review, the Washington State Supreme Court Commissioner

5    addressed Division Two's holding affirming exclusion of the other suspect evidence:

6    > Mr. Mitchell first argues that the trial court erred in excluding other suspect
     > evidence, preventing him from pointing to Mr. Chandler as the murderer. A

7    > defendant has a constitutional right to present admissible evidence in their defense,
     > but there is no constitutional right to present irrelevant evidence. [Citation

8    > omitted.] Evidence is relevant if it has any tendency to make a material fact more
     > or less probable. [Citation omitted.] Other suspect evidence in particular is relevant

9    > if it tends to connect someone other than the defendant to the charged crime.
     > [Citation omitted.] Evidence of remote acts disconnected with the crime, or

10   > evidence that does nothing more than raise suspicion that someone else committed
     > the crime, does not meet this standard. [Citation omitted.] In other words, remote

11   > and speculative evidence of character, opportunity, and motive are not enough; the
     > defendant must show "'some train of facts or circumstances'" linking the other

12   > person to the crime. [Citation omitted.] Further, the focus should be on whether
     > the evidence creates reasonable doubt that the defendant committed the crime, not

13   > whether it proves beyond a reasonable doubt that a third party committed the crime.
     > [Citation omitted.]

14   > The Court of Appeals applied this well-settled precedent and held that Mr.
     > Mitchell's other suspect evidence involving Mr. Chandler was merely speculative

15   > and only created a suspicion that Mr. Chandler could have committed the crime,
     > which is insufficient. Mr. Mitchell argues that the jury would have had a much

16   > different view of the evidence if it had learned that there were other violent men in
     > Ms. Robinson's life, but nothing in the evidence regarding Mr. Chandler rises to

17   > the level of requiring a trial court to allow the other suspect evidence. This issue
     > does not merit review under RAP 13.4(b)(3).

18   Dkt. 9-2, at 1498–99.

19   Although respondent cites to Division Two's opinion (Dkt. 8, at 17), the Court addresses

20   the Commissioner's ruling, which was the last reasoned decision on the issue. *See Barker v.*

21   *Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) (holding that the Washington State Supreme Court

22   Commissioner's seven page order explaining in detail why review was denied was the "last

23   reasoned state court decision."). The Court notes that throughout the Answer, respondent

24

1   addresses Division Two's opinion on collateral review.  But here, the Supreme Court

2   Commissioner issued a six-page ruling denying review, including substantive analysis of the

3   viability of petitioner' arguments and the Commissioner's independent reasoning.  *See* Dkt. 9-2,

4   at 1496–1501.  "When more than one state court has adjudicated acclaim, we analyze the last

5   reasoned decision." *Barker*, 423 F.3d at 1092.  "[A] Washington Supreme Court order denying

6   review of a PRP, when it is reasoned and discusses the merits, it an 'adjudication on the merits'

7   under the AEDPA[.]" *Id.* at 1093.  The Court will look at Division Two's opinion only where

8   the ruling denying review adopted or substantially incorporated the reasoning of Division Two's

9   opinion. *Id.*

10       With these principles in mind, the Court turns to the applicable law governing petitioner's

11   claim that he was denied the right to present a defense.

12                **B.  Legal Standards:  Right to Present a Defense**

13       "[T]he Constitution guarantees defendants 'a meaningful opportunity to present a

14   complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v.*

15   *Trombetta*, 467 U.S. 479, 485 (1984)).  However, "[a] defendant's right to present relevant

16   evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v.*

17   *Scheffer*, 523 U.S. 303, 308 (1998).  A criminal defendant "does not have an unfettered right to

18   offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules

19   of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).

20       The Supreme Court has explained that "the Constitution permits judges to exclude

21   evidence that is repetitive . . . only marginally relevant or poses an undue risk of harassment,

22   prejudice, [or] confusion of the issues." *Holmes v. South Carolina*, 547 U.S. 319, 326–27 (2006)

23   (internal quotations omitted).

24

1

2

3

> While the Constitution . . . prohibits the exclusion of defense evidence under rules
> that serve no legitimate purpose or that are disproportionate to the ends that they
> are asserted to promote, well-established rules of evidence permit trial judges to
> exclude evidence if its probative value is outweighed by certain other factors such
> as unfair prejudice, confusion of the issues, or potential to mislead the jury.

4  *Id.* at 326.

5          With respect to the admission of evidence proffered by criminal defendants to show that

6  someone else committed the crime with which they are charged, evidence of potential third-party

7  culpability must be admitted when, under the "facts and circumstances" of the individual case, its

8  exclusion would deprive the defendant of a fair trial.  *See Chambers v. Mississippi*, 410 U.S. 284,

9  302–03 (1973) (exclusion of evidence of a third party confession deprived the defendant of the

10  right to a fair trial).  Nonetheless, it is "widely accepted" for courts to have rules excluding

11  evidence of third-party culpability when the evidence is remote and lacks connection to the

12  crime, or when the evidence is speculative, or when it does not tend to prove or disprove a

13  material fact in issue at the defendant's trial.  *Holmes v. South Carolina*, 547 U.S. 319, 327

14  (2006) (cataloguing such rules, including Washington State's).

15          **C. Analysis**

16          First, the Commissioner did not unreasonably determine the facts in light of the evidence

17  presented when he concluded that "Mr. Mitchell's other suspect evidence involving Mr.

18  Chandler was merely speculative and only created a suspicion that Mr. Chandler could have

19  committed the crime, which is insufficient."  *See* Dkt. 9-2, at 1499.  Although Detective O'Hern

20  told interviewers that he personally suspected Chandler, Detective O'Hern also acknowledged

21  that police never "had any evidence to arrest [Chandler]"—even with the polygraph results.  Dkt.

22  9-2, at 1270.

23

24

1    Petitioner argues that he showed a sufficient connection between Chandler and the

2    murder because Chandler failed the polygraph examination. Dkt. 10, at 5. But the polygraph

3    examination does not affirmatively create a link between Chandler and the crime. The

4    Commissioner's conclusion that this evidence amounted to no more than a suspicion that

5    Chandler committed the crime was a reasonable characterization of the facts in light of the

6    evidence presented.

7    Further, the Commissioner's reasoning was not contrary to or an unreasonable

8    application of clearly established federal law. Indeed, the Supreme Court has cited

9    Washington's rule about "other suspect" evidence with approval as an example of a "widely

10    accepted" rule regulating the admission of "other suspect" evidence. *Holmes*, 547 U.S. at 327

11    n.*.

12    And at least one case from within this District has concluded that the right to present a

13    defense was not infringed by exclusion of evidence under this rule. In *Wade v. Mason*, the Court

14    found that exclusion of other suspect evidence did not merit habeas relief where there was no

15    specific evidence linking the other suspect to the crime. No. C16-1645-JCC-MAT, 2017 WL

16    1088387 (W.D. Wash. Feb. 15, 2017), *report and recommendation adopted*, No. C16-1645-JCC,

17    2017 WL 1079997 (W.D. Wash. Mar. 22, 2017). In that case, the other suspect was a "bad actor

18    with a violent history involving" the victim and had left threatening voicemails on the victim's

19    answering machine. But crucially, no witness or evidence other than speculation could place the

20    other suspect at the crime scene. *Id.* at *12–*13. The Court concluded the right to present a

21    defense was not violated where the state court had appropriately found that "there is no

22    admissible evidence pointing to a nonspeculative link between [the other suspect] and the

23    crime[.]" *Id.* at 13. So to here—the state court applied the same evidentiary rule and reasonably

24

1    concluded that neither the polygraph results nor any other evidence created more than a

2    speculative link between Chandler and the murder.  *Compare Cudjo v. Ayers*, 698 F.3d 752,

3    765–66 (9th Cir. 2012) (violation of the right to present a defense where the excluded evidence

4    prevented defendant from establishing that the other suspect had confessed to the crime).

5         Petitioner argues that nevertheless, under certain circumstances, exclusion of highly

6    probative evidence under a valid evidentiary rule may violate the right to present a defense.  *See*

7    Dkt. 10, at 6.  But "[o]nly rarely ha[s the Supreme Court] held that the right to present a

8    complete defense was violated by the exclusion of defense evidence under a state rule of

9    evidence."  *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (per curiam).

10        One of those "rare cases" occurred in *Holmes*, where the admissibility of "other suspect"

11   evidence was conditioned on the strength of the prosecution's case—ignoring the probative value

12   of the other suspect evidence, if credited.  547 U.S. at 330 ("Just because the prosecution's

13   evidence, *if credited,* would provide strong support for a guilty verdict, it does not follow that

14   evidence of third-party guilt has only a weak logical connection to the central issues in the

15   case.").  But *Holmes* approves of the type of inquiry that the state courts conducted here:

16   looking at the probative value of the evidence as tending to show that someone other than the

17   petitioner committed the crime.  *See also State v. Franklin*, 180 Wn.2d 371, 381 (2014) ("[S]ome

18   combination of facts or circumstances must point to a nonspeculative link between the other

19   suspect and the charged crime.").  The Commissioner did not apply the rule by evaluating the

20   strength of the State's case, and accordingly did not run afoul of the principles set forth in

21   *Holmes*.

22

23

24

1      In short, petitioner fails to show that the Commissioner's ruling in this regard was

2   contrary to, or an unreasonable application of, clearly established federal law.  Petitioner's first

3   ground for relief should be denied.

4   **III.  Prosecutorial Misconduct**

5      Petitioner argues that the prosecutor committed misconduct in closing argument when he

6   referenced the physical evidence and when he called petitioner's credibility into question.  *See*

7   Dkt. 1, at 8.

8              **A.  Facts Regarding Alleged Prosecutorial Misconduct**

9      In closing, the prosecutor addressed the DNA evidence and in doing so, argued—

10     That DNA that was left behind, his blood that was left behind, that's as good as a
       photograph of the crime.  He was there—he was there that night, and he bled that
11     night; and he didn't just bleed a little bit, and he didn't just bleed in one place.  He
       bled far and wide in that apartment, and his blood was mixed with hers *which means*
12     *they bled at the same time.*

13  Dkt. 9-1, at 1051 (emphasis added).

14     The prosecutor also argued that the blood collected from the victim's jacket was

15  important:

16     The blood on the jacket was Mr. Mitchell's and then a second donor consistent with
       Linda Robinson which only makes sense because it was transfer blood; remember
17     that?  Detective Kobel told you the blood on the dresser and on the papers, that was
       drops; but the blood on the jacket was transfer blood from touching.  If you're cut
18     and you drip blood, it's your blood.  If you've just murdered somebody with, what,
       twelve, fourteen stab wounds, your hands are going to be bloody with your blood
19     and her blood; so it's significant that the blood on the jacket is both transfer blood
       and mixed blood *because it shows not only did Mr. Mitchell bleed there that night,*
20     *he bled at the same time as Linda*; and the reason that he bled at the same time as
       Linda is that he murdered Linda with a knife.
21  Dkt. 9-1, at 1057–58 (emphasis added).

22     The prosecutor also addressed petitioner's own testimony.  *See* Dkt. 9-1, at 1064.  The

23  prosecutor reminded the jury that petitioner, like "any criminal defendant, is presumed innocent

24

REPORT AND RECOMMENDATION - 15

1   until proof beyond a reasonable doubt; but when he takes the stand and testifies, he's the same as

2   any other witness.  He's not presumed to be telling the truth."  Dkt. 9-1, at 1064.  The prosecutor

3   then reminded the jury of their instructions and argued that petitioner's testimony was

4   inconsistent with the evidence in various regards.  *See* Dkt. 9-1, at 1064–66.

5       In rebuttal closing, the prosecutor against discussed the "mixed blood" again, in the

6   context of his argument about the DNA evidence:

> You know, time passes, memories fade, people make up stories; but the one thing
> that doesn't fade and doesn't make up stories, that has no interest or bias in the
> outcome is the DNA, the DNA of the killer; and we know it's the killer because
> of where it was deposited away from the body, on the back of the body, in the
> bedroom, how it was deposited, drips, not spatter from the fight, drips from a cut;
> and when it was deposited, the same time that Linda Robinson bled, mixed with
> her blood.  *She bled that night when she was murdered, and Mr. Mitchell's blood*
> *mixed with hers because he's the one who murdered her.*

12  Dkt. 9-1, at 1113–14 (emphasis added).

13      On collateral review, petitioner raised arguments that the prosecutor committed

14  misconduct, and in the ruling denying review, the Commissioner concluded—

> [A]s Mr. Mitchell concedes, he did not object to these statements at trial and thus
> must meet the high burden of showing that the comments were so flagrant and ill-
> intentioned that any curative instruction would have been futile.  [Citation
> omitted.]  Here, even assuming the closing argument crossed the line, Mr.
> Mitchell does not show that a curative instruction would have been futile.

18  Dkt. 9-2, at 1499–1500.

19          **B.  Legal Principles**

20      During closing arguments, a prosecutor is allowed a reasonably wide latitude and can

21  argue reasonable inferences from the evidence.  *United States v. Gray*, 876 F.2d 1411, 1417 (9th

22  Cir. 1989).  However, it is improper for a prosecutor to make statements or inferences to the jury

23

24

1    that he knows to be false or has a strong reason to doubt or to argue facts not in the evidence.

2    *Id.*; *United States v. Reyes*, 577 F.3d 1069, 1077 (9th Cir. 2009).

3         Prosecutorial misconduct warrants habeas relief only if it "so infected the trial with

4    unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*,

5    477 U.S. 168, 181 (1986) (internal quotation marks omitted).  After establishing misconduct, a

6    petitioner also must show prejudice—that is, that the misconduct "rendered the trial

7    fundamentally unfair." *See Wood v. Ryan*, 693 F.3d 1104, 1116 (9th Cir. 2012), *cert. denied*,

8    134 U.S. 239 (2013).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial

9    misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*,

10   455 U.S. 209, 219 (1982).  The alleged misconduct must be examined within the context of the

11   entire trial.  *United States v. Young*, 470 U.S. 1, 12 (1985).

12                   **C.  Analysis:  Mixed Blood Arguments**

13        Petitioner takes issue with the prosecutor's arguments about "mixed blood," asserting that

14   there was no "forensic evidentiary basis" to conclude "that the fact that [petitioner's] blood was

15   found in a mixture with the victim's blood means that they bled at the same time." Dkt. 1, at 8.

16        To the contrary, witnesses testified that "transfer blood"—blood that someone touches

17   (for instance by placing their hand in a pool of blood) and then transfers to another surface—was

18   found on a jacket and matched both petitioner's and the victim's DNA profiles.  Dkt. 9-1, at 51,

19   980–81.  It is a reasonable inference that to be transferred from surface to surface in such a

20   manner, blood must be wet, and it is also a reasonable inference that the simultaneous presence

21   of wet blood from two people means that they were bleeding at the same time.

22        During his closing argument, the prosecutor properly highlighted the significance of the

23   mixed blood found on the jacket.  *See* Dkt. 9-1, at 1057–58.  And, this testimony was adequate

24

1    for the prosecutor to make his "mixed blood" argument, which he referred to throughout his

2    closing and rebuttal argument.  The Court notes that although the prosecutor pointed to other

3    mixed blood samples, the prosecutor did not specifically argue that any of the mixed blood

4    samples other than those found on the jacket suggested that the victim and her attacker bled at

5    the same time.  *See* Dkt. 9-1, at 1051, 1053, 1058, 1110, 1114.

6          Even if the prosecutor had erred in making the "mixed blood" argument, the Court notes

7    that the prosecutor otherwise argued—with evidentiary support—that the blood sample evidence

8    showed that it was petitioner who killed the victim, not an unidentified assailant.  The prosecutor

9    pointed out that petitioner's blood was found throughout the apartment, including, notably, on a

10   telephone cord that had been cut and on the victim's pants.  Dkt. 9-1, at 1052, 1058, 1060; *see*

11   *also* Dkt. 9-1, at 63–66, 978–99, 985 (trial testimony that blood samples from throughout the

12   apartment matched petitioner's DNA profile).  The prosecutor also pointed out that there was

13   other evidence that the assailant had been injured in the course of the attack.  *See* Dkt. 9-1, at

14   1054; *see also* Dkt. 9-1, at 56 (detective's testimony that the evidence supported that the

15   assailant had been injured during the attack).  This evidence supported the prosecutor's overall

16   argument that petitioner's blood was in the apartment because he was the killer, not because he

17   had sustained a minor injury to his hand.

18         Viewed in the context of the evidence and the closing arguments as a whole, the

19   prosecutor did not misstate the evidence regarding the blood samples, and any error in this regard

20   did not render the trial fundamentally unfair.  Thus petitioner fails to show that the state court

21   unreasonably applied clearly established federal law when it denied relief on petitioner's

22   argument that the prosecutor committed misconduct related to the mixed blood arguments.

23            **D.  Analysis:  Arguments about Petitioner's Credibility**

24

Petitioner takes issue with the prosecutor's arguments calling petitioner's credibility into question. In particular, petitioner argues that the prosecutor erred because there were not, in fact, inconsistencies between petitioner's testimony and the trial evidence. Dkt. 10, at 7–8. As noted above, to the extent that petitioner restates his argument that the prosecutor's mixed blood argument went beyond the evidence, petitioner's argument fails.

In closing, the prosecutor also highlighted the lack of details of petitioner's testimony about the unknown man who entered the victim's apartment and started fighting with petitioner. Dkt. 9-1, at 1064–65. The prosecutor pointed out that petitioner's account of whom the man began "swinging at" was inconsistent and that petitioner changed his story when the inconsistency was pointed out to him. *See* Dkt. 9-1, at 1064–65. The prosecutor also highlighted that testimony of the victim's daughter and of the victim's neighbors was inconsistent with petitioner's story because neither the daughter nor the neighbors heard such an altercation. Dkt. 9-1, at 1065–66.

Petitioner does not challenge any of these arguments, instead focusing on the "mixed blood" testimony. But the prosecutor went beyond that argument, also pointing out inconsistencies in petitioner's testimony and aspects of petitioner's testimony that were difficult to credit. A prosecutor is entitled to argue that the evidence shows that a defendant's account is not credible where the prosecutor relies on reasonable inferences from the trial evidence. *See, e.g.*, *United States v. Ruiz*, 710 F.3d 1077, 1083 (9th Cir. 2013) (collecting cases stating that a prosecutor can argue that a defendant is lying so long as the prosecutor relies on permissible inferences from the record); *United States v. Moreland*, 622 F.3d 1147, 1161 (9th Cir. 2010) ("[T]he prosecution may refer to the defendant as a liar if it is commenting on the evidence and asking the jury to draw reasonable inferences.") (citation and internal quotation marks omitted).

1    Indeed, as the prosecutor appropriately pointed out, "there is a "longstanding rule that when a

2    defendant takes the stand, 'his credibility may be impeached and his testimony assailed like that

3    of any other witness.'"  *Portuondo v.Agard*, 529 U.S. 61, 69 (2000) (quoting *Brown v. United*

4    *States*, 356 U.S. 148, 154 (1958)).  Thus, the prosecutor in closing argument may voice doubt

5    about the veracity of the defendant's testimony.  *See United States v. Moreland*, 622 F.3d 1147,

6    1161 (9th Cir. 2010); *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000); *Dubria v.*

7    *Smith*, 224 F.3d 995, 1004 (9th Cir. 2000) (en banc).

8        Therefore, petitioner also fails to show that the state court acted contrary to or

9    unreasonably applied clearly established federal law when it denied relief on petitioner's

10   argument that the prosecutor committed misconduct when discussing petitioner's credibility.

11       Petitioner's second ground for relief should be denied.

12   **IV.  Confrontation Clause**

13       Petitioner's third ground for relief is that allowing police officers to read from their

14   reports when they did not have an independent recollection of the facts and circumstances

15   violated the Confrontation Clause.  Dkt. 1, at 9.

16   **A.  Facts Related to Ground Three**

17       Over petitioner's opposition (Dkt. 9-1, at 348), the trial court admitted police reports and

18   property sheets drafted by Officers Johnson and Schlosser "as well as other similarly situated

19   witnesses."  Dkt. 9-1, at 1237.

20       Officer Johnson testified that he had no independent recollection of the crime scene.  Dkt.

21   9-1, at 374.  Officer Johnson read the following paragraph from his property report of evidence

22   recovered from the scene:

23           I proceeded to collect what appeared to be blood from several areas of the
            residence.  This included the apparent blood on the bathroom floor and carpet

24

samples with apparent blood from the hallway outside the bathroom door. Samples collected in the bedroom included areas of carpet from the floor, apparent blood behind the door to the bedroom, the edge of the vanity, and a drawer, as well as above the mentioned—the above-mentioned papers with apparent blood. Also collected was a child's coat which had apparent blood spatter on it. Other samples collected were on the wall in the hallway across from the bathroom, the entry hallway wall next to the living room and the wall next to the kitchen just above and to the right of the victim's feet. See the property report for a complete list of evidence recovered. I took a series of photographs prior to actual recovery of these items with numbered cards next to the items collected. The refrigerator drawer was also collected as an item of evidence.

Dkt. 9-1, at 380; *see also* Dkt. 9-1, at 376. Evidence that Officer Johnson had collected from the scene was also admitted during his testimony, again over petitioner's objection. *See* Dkt. 9-1, at 401–409.

Similar to Officer Johnson, Officer Schlosser testified that he had no independent recollection of the investigation. Dkt. 9-1, at 594. Officer Schlosser read the following portions of his forensic report of the incident (*see* Dkt. 9-1, at 594–95) to the jury:

I took overall videos of the outside front of the—of the apartment building and a Datsun B-210 with Washington license Union Frank—UFY 945 and a Dodge Charger with Washington License No. ALV RNS that were parked in front of the—in front of the building. Videos were also taken of the interior of Unit No. 4 with emphasis on the kitchen, master bedroom, the living room, hallway, and the hall—the living room, dining room, and hallway. Blood or blood spatter was present in the master bedroom and the hallway, kitchen floor, walls, and refrigerator near the front entry door. The victim was on the floor with her feet in the hallway and her body in the kitchen. She was laying face down. The victim and the—and the location—and the condition and location were, also, videotaped. Identification took photographs while I video—while I was videotaping them.
. . . .
I processed the residence for latent fingerprints, recovering—recovering fingerprints from the inside of the front door and the door of the refrigerator. Officer Johnson collected evidence, collected blood from various locations throughout the residence; and I assisted him in the collection of other—other evidence. Prior to collection of the blood evidence from the—the victim, from the—from the scene, measurements were taken for a future sketch.

Dkt. 9-1, at 596–98.

1

## B. Commissioner's Ruling

2

In his PRP, petitioner argued that allowing Schlosser and Johnson to read from their

3

reports violated the Confrontation Clause.  *See* Dkt. 9-2, at 10.  After Division Two rejected

4

these arguments, the Commissioner denied review, concluding—

5

> Next, Mr. Mitchell asserts that his confrontation right was violated because officers
6
> testified at trial by reading from reports that they did not remember.  In his motion
> for discretionary review, Mr. Mitchell provides no citation to authority supporting
> the implied proposition that an available witness with a lack of recollection results
7
> in a confrontation clause violation.  The appellate court will not consider such
> unsupported constitutional arguments.
8
Dkt. 9-2, at 1500.

9

Although it appears that the Commissioner rejected the Confrontation Clause argument

10

on the basis of a state procedural rule, respondent addresses this ground on the merits.  *See* Dkt.

11

8, at 33.  The undersigned will address the matter on the merits, as well.  *See Franklin v.*

12

*Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more

13

complex than the merits issues presented by the appeal, so it may well make sense in some

14

instances to proceed to the merits if the result will be the same."); *accord Butler v. Scribner*, No.

15

06-CV-1296-W(POR), 2008 WL 4542403, at *7 (S.D. Cal. Oct. 2, 2008) (addressing issue on

16

the merits despite that the last reasoned decision declined to reach the issue on the basis of a

17

procedural bar).

18

## C. Analysis

19

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall

20

enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. am. VI.  The

21

Confrontation Clause seeks to ensure the reliability of evidence; but it is a procedural rather than

22

a substantive guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  The touchstone of

23

the Confrontation Clause is that evidence be subjected to cross-examination.  *See id.*; *see also*

24

1    *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974) (noting "a primary interest" secured by the

2    Confrontation Clause "is the right of cross-examination"). The right to cross-examine under the

3    Confrontation Clause provides the opportunity to "expose to the jury the facts from which jurors

4    . . . could appropriately draw inferences relating to the reliability of the witness." *Davis*, 415

5    U.S. at 318.

6            In *Crawford* itself, the Supreme Court noted that "when the declarant appears for cross-

7    examination at trial, the Confrontation Clause places no constraints at all on the use of his prior

8    testimonial statements. . . .  The Clause does not bar admission of a statement so long as the

9    declarant is present at trial to defend or explain it."  541 U.S. at 59 n.9; *see also Kentucky v.*

10   *Stincer*, 482 U.S. 730, 739 (1987) ("[T]he Confrontation Clause guarantees only 'an opportunity

11   for effective cross-examination, not cross-examination that is effective in whatever way, and to

12   whatever extent, the defense might wish.'" (Internal citation omitted.)).

13           Here, the Confrontation Clause was satisfied because Officers Johnson and Schlosser

14   were both subject to cross-examination regarding the reports that they read from.  Indeed

15   petitioner conducted a lengthy and detailed cross-examination of each witness.

16           To the extent that petitioner argues that his Confrontation Clause rights were violated

17   because the officers did not recall the investigation or the preparation of their reports, petitioner

18   provides no federal authority holding as much.  In fact, the Supreme Court has held that "a

19   witness' inability to 'recall either the underlying events that are the subject of an extra-judicial

20   statement or previous testimony or recollect the circumstances under which the statement was

21   given, does not have Sixth Amendment consequence.'" *United States v. Owens*, 484 U.S. 554,

22   558 (quoting *California v. Green*, 399 U.S. 149, 157–64 (1970) (Harlan, J., concurring)); *see*

23   *also Owens*, 484 U.S. at 559 (adopting Justice Harlan's statements in *Green*); *accord United*

24

1    *States v. Spotted War Bonnet*, 933 F.2d 1471, 1474 (8th Cir. 1991) ("Under *Owens* . . . a

2    perfectly satisfactory cross-examination is not required by the Clause, and a witness who cannot

3    remember the details of statements she has made in the past can still be sufficiently available for

4    cross-examination to satisfy the constitutional requirement.").

5          In short, petitioner fails to show that the denial of his Confrontation Clause arguments

6    was contrary to or an unreasonable application of clearly established federal law.  His third

7    ground for relief should accordingly be denied.

8        **V.  Ineffective Assistance of Counsel**

9          Petitioner's fourth ground for relief is that his trial counsel rendered ineffective assistance

10    by failing to (1) request an instruction regarding "spoliation of the evidence," (2) renew the

11    motion to introduce the "other suspect" evidence after petitioner testified, or (3) object to the

12    alleged prosecutorial misconduct in closing.  *See* Dkt. 1, at 11.

13        **A.  Legal Principles:  Ineffective Assistance of Counsel**

14          To prevail on a claim that counsel rendered ineffective assistance, a petitioner must show

15    both that "counsel's performance was deficient" and that "the deficient performance prejudiced

16    the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To show prejudice, a

17    defendant "must show that there is a reasonable probability that, but for counsel's unprofessional

18    errors, the result of the proceeding would have been different." *Id.* at 694.

19          Moreover, when reviewing a habeas claim that counsel rendered ineffective assistance,

20    the Supreme Court has explained—

21          the pivotal question is whether the state court's application of the *Strickland*
         standard was unreasonable.  This is different from asking whether defense

22          counsel's performance fell below *Strickland*'s standard.  Were that the inquiry, the
         analysis would be no different than if, for example, this Court were adjudicating a

23          *Strickland* claim on direct review of a criminal conviction in a United States district
         court.  Under AEDPA, though, it is a necessary premise that the two questions are

24

different.  For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  [Internal citation omitted.]  A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision.  [Internal citation omitted.]

*Harrington v. Richter*, 562 U.S. 86, 101 (2011).

## B.  Jury Instruction

### 1.  Relevant Facts

The weapon used to murder the victim was never recovered.  Dkt. 9-1, at 751–52.  At trial, Detective O'Hern testified that in his notes about the investigation into the victim's death, he had also recorded—under a separate incident number—that a bloody knife and a shotgun were found in February 1993 in the "Driftwood" apartment complex.  Dkt. 9-1, at 689.  The apartment complex was not near the murder scene.  Dkt. 9-1, at 691.  Detective O'Hern testified that he requested that the knife be processed for fingerprints and possible blood on the blade.  Dkt. 9-1, at 724.  However, this request was apparently never followed up on.  *See* Dkt. 9-1, at 724.  In summary, there was never any connection drawn between the bloody knife and shotgun recovered from the Driftwood apartments and the murder in this case.  That avenue for further investigation is apparently closed.

On collateral review, the Commissioner rejected petitioner's argument related to the spoliation instruction both because it was not deficient performance and because petitioner failed to show prejudice:  "the decision to seek a jury instruction is largely strategic, and in any event Mr. Mitchell fails to demonstrate prejudice."  Dkt. 9-2, at 1501.

### 2.  Analysis

1    Counsel does not perform deficiently by failing to request an instruction where the trial

2    court would not grant the request. *Johnson v. Cullen*, 704 F. Supp. 2d 869, 912 (N.D. Cal. 2010)

3    (citing *Sanders v. Ratelle,* 21 F.3d 1446, 1456 (9th Cir.1994)) ("*Strickland* and its progeny do

4    not require that trial counsel make futile motions, and thus, the decision of petitioner's counsel

5    was reasonable under the circumstances.").

6    Spoliation—the intentional destruction of evidence—"may be considered generally as

7    tending to corroborate the proponent's case and to discredit that of the [destroying] party." 2

8    John W. Strong, *McCormick on Evidence* § 265, at 192 (4th ed. 1992), *cited in Henderson v.*

9    *Tyrrell*, 80 Wash. App. 592, 605 (1996), *as amended on denial of reconsideration* (Mar. 14,

10   1996).  In Washington, to determine whether to give a spoliation of the evidence instruction, a

11   court will look to "the potential importance or relevance of the missing evidence and the

12   culpability or fault of the adverse party." *Tavai v. Walmart Stores*, *Inc.*, 176 Wn. App. 122, 135

13   (2013).  Culpability requires inquiring whether the adverse party acted in bad faith or conscious

14   disregard of the importance of the evidence, or whether there was some innocent explanation for

15   the destruction.  *Henderson*, 80 Wn. App. at 609.

16   Here, the only evidence connecting the knife to the crime was that detective O'Hern

17   recorded the knife in his notebook about the investigation—although under a different incident

18   number.  Moreover, there was no evidence at trial to support that police intentionally destroyed

19   the knife or failed to follow up on processing it for any culpable reason.  Because the request for

20   a spoliation instruction would have relied entirely on speculation, petitioner was not entitled to

21   the instruction.  *See, e.g.*, *State v. Ager*, 128 Wn.2d 85, 93 (1995) (A defendant is not entitled to

22   an instruction unsupported by evidence).

23

24

1    Moreover, even if the Court had instructed the jury on spoliation of the evidence, there

2  was, as noted above, no evidence beyond mere speculation tending to support that the state

3  intentionally destroyed evidence that undermined the State's case against petitioner.  Thus

4  petitioner cannot show a reasonable probability that but-for the alleged error, the outcome would

5  have changed.

6    Therefore, the Commissioner's rejection of petitioner's claim that his counsel rendered

7  ineffective assistance for failing to request the instruction was not contrary to or an unreasonable

8  application of clearly established federal law.

9    **C.  Failure to Renew Request to Admit "Other Suspect" Evidence**

10    **1.  Relevant Facts**

11    As discussed above, the trial court denied both of petitioner's requests—made before trial

12  and after detective O'Hern's testimony—to admit evidence that Lee Chandler was a suspect.

13    Petitioner testified in his defense, asserting that on one night—possibly, but not

14  definitively, the night of the murder (Dkt. 9-1, at 851)—he was at the victim's apartment when

15  an unknown man came to the apartment.  Dkt. 9-1, at 853.  Petitioner testified that he and the

16  unknown man "trade[d] blows" (Dkt. 9-1, at 855), injuring petitioner's hand (Dkt. 9-1, at 857),

17  and then the man left, saying that he would "be back."  Dkt. 9-1, at 855.  In petitioner's words,

18  the unknown assailant was "an average black guy"—on cross-examination, petitioner could not

19  provide a more detailed description.  Dkt. 9-1, at 872.

20    The Supreme Court Commissioner's ruling does not appear to have addressed this issue,

21  although acknowledging that petitioner raised it in his petition for review.  *See* Dkt. 9-2, at 1501

22  ("Mr. Mitchell argues that trial counsel failed to renew efforts to introduce 'other suspect'

23  evidence following Mr. Mitchell's testimony. . . .").  Therefore the Court will "look through" to

24

1    the last reasoned state court decision addressing this argument: Division Two's denial of

2    petitioner's PRP.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–05 (1991).

3        Division Two rejected petitioner's argument for the following reasons:

4            Mitchell contends that defense counsel should have raised the issue again
        after his own testimony that on the last night he saw Robinson at her apartment, a
5        man arrived and started a fight with him.  He apparently claims that the man could
        have been Chandler.  However, Mitchell has not shown that the trial court would
6        have admitted any additional other suspect evidence.  As discussed above, the
        additional evidence Mitchell references does not show a nonspeculative link
7        between Chandler and the crime.
            Regarding the second prong of an ineffective assistance analysis, Mitchell
8        fails to show a reasonable probability that the outcome of the trial would have been
        different had the other suspect evidence been admitted.  As noted above, defense
9        counsel did elicit evidence that Chandler was a suspect.  There is no indication that
        additional evidence would have affected the outcome of the trial.
10           In addition, there was significant DNA evidence implicating Mitchell at
        trial—his blood was identified on the jeans Robinson was wearing when she was
11       found, on a jacket in her apartment, in her bathroom, and on the telephone cord that
        had been ripped out of the wall.  And Mitchell's own testimony seemed to place
12       him at Robinson's apartment on the night she died.  Even if more extensive
        evidence about Chandler as a possible suspect was admitted, there is no indication
13       that the jury would have ignored the strong evidence that Mitchell had killed
        Robinson.

14   *Matter of Mitchell*, 2019 WL 6332169, at *10.

15                    **2.  Analysis**

16       As noted above, the trial court denied the introduction of "other suspect" evidence on the

17   basis that petitioner had failed to show a sufficient, non-speculative connection between the

18   crime and Chandler.  Dkt. 9-1, at 1238.  Nothing in petitioner's trial testimony established a

19   firmer link between Chandler and the murder.  Petitioner could not remember anything more

20   than vague details about the claimed unknown assailant—indeed, he could not even recall

21   whether the alleged attack occurred on the same night that the victim was murdered.  Petitioner

22   did not name Chandler during his testimony, and petitioner points to no trial evidence in support

23   of his argument in his habeas petition.

24

The state court reasonably determined the facts in light of the evidence presented when it concluded that petitioner failed to show anything more than a speculative link between petitioner's unknown assailant and Chandler, even when taking petitioner's testimony into account. Further, the state court's determination that counsel was not defective for failing to renew a request that would have been futile was not contrary to or an unreasonable application of clearly established federal law.

Petitioner fails to show that this Court should grant relief based on his claim that his trial counsel rendered deficient performance by not renewing the request to admit "other suspect" evidence after petitioner testified.

### D.  Alleged Prosecutorial Misconduct

The Commissioner also rejected petitioner's argument that his trial counsel rendered ineffective assistance by failing to object to the prosecutor's alleged misconduct during closing argument. *See* Dkt. 9-2, at 1501. In doing so, the Commissioner referred to his discussion concluding that petitioner's prosecutorial misconduct argument failed. *See* Dkt. 9-1, at 1500, 1501.

In his habeas petition, petitioner again claims that his counsel rendered ineffective assistance by failing to object to portions of closing argument that petitioner has also raised as the basis for his claim of prosecutorial misconduct. *See* Dkt. 1, at 11. But as discussed extensively above, petitioner fails to show that the cited argument was improper. *See supra*, part III. Failure to object to a prosecutor's argument that was not improper is not deficient performance. *Accord Woodward v. Gilbert*, No. 315CV05843RBLJRC, 2016 WL 3812060, at *6 (W.D. Wash. June 6, 2016), *report and recommendation adopted*, No. 15-CV-05843 RBL, 2016 WL 3690102 (W.D. Wash. July 12, 2016) ("Furthermore, in the absence of any clearly

1  improper comments, defense counsel's failure to object is not professionally unreasonable under

2  the *Strickland* standard.").

3      Accordingly, petitioner fails to show that the Commissioner acted contrary to or

4  unreasonably applied clearly established federal law when the Commissioner rejected

5  petitioner's claim of ineffective assistance of counsel on the basis of failure to object to the

6  prosecutor's alleged misconduct in closing.

7      Petitioner's fourth ground for relief should be denied.

8  **VI.  Miscellaneous Matters**

9      In his petition, petitioner refers to a fifth ground for relief—"ineffective assistance of

10  appellate counsel"—that he does not in fact raise in his petition.  *See* Dkt. 1, at 7, 8, 10, 11.

11  Therefore the Court does not address whether there was "ineffective assistance of appellate

12  counsel."  *See* Rule 2(c), Rules Governing § 2254 Cases in the United States District Courts

13  ("The petition must . . . specify all grounds for relief available to the petitioner" and "state the

14  facts supporting each ground.").

15      In his response to the Answer, petitioner also states that his case should be reversed on

16  the basis of cumulative error.  Dkt. 10, at 11.  As petitioner does not in fact raise cumulative

17  error as a ground for relief in his petition, the Court does not address his arguments.  *See* Rule

18  2(c), Rules Governing § 2254 Cases.

19                **CERTIFICATE OF APPEALABILITY**

20      Petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district

21  court's dismissal of the federal habeas petition only after obtaining a certificate of appealability

22  (COA) from a district or circuit judge.  A certificate of appealability may issue only if petitioner

23  has made "a substantial showing of the denial of a constitutional right."  *See* 28 U.S.C. §

24

1   2253(c)(2).  Petitioner satisfies this standard "by demonstrating that jurists of reason could

2   disagree with the district court's resolution of his constitutional claims or that jurists could

3   conclude the issues presented are adequate to deserve encouragement to proceed further."

4   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (*citing Slack v. McDaniel*, 529 U.S. 473, 484

5   (2000)).  Pursuant to this standard, this Court concludes that petitioner **is** entitled to a certificate

6   of appealability with respect to this petition.

7                                          **CONCLUSION**

8          The petition for habeas corpus (Dkt. 1) should be denied, a certificate of appealability

9   should issue, and the matter should be closed.

10         Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

11  fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P.

12  6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo*

13  review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

14  of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v.*

15  *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

16  imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on

17  November 6, 2020, as noted in the caption.

18         Dated this 16th day of October, 2020.

19

20         _____

21         J. Richard Creatura
           United States Magistrate Judge

22

23

24